[L. A. No. 24470. In Bank. Sept. 13, 1957.]

JOHNY E. McCARROLL et al., Respondents, v. LOS AN-
GELES COUNTY DISTRICT COUNCIL OF CAR-
PENTERS (an Unincorporated Association) et al., Ap-
pellants.

Arthur Garrett and James M. Nicoson for Appellants.

Hill, Farrer & Burrill and Ray L. Johnson, Jr., for Respondents.

Roth & Bahrs and George O. Bahrs as Amici Curiae on behalf of Respondents.

TRAYNOR, J.—Plaintiffs are engaged in the contracting business in the Los Angeles area. They brought the present action against defendant labor unions and their officers for damages and injunctive relief against strikes allegedly called by defendants.

In their second amended complaint plaintiffs allege that plaintiffs and defendants are parties to a collective bargaining agreement known as the BCA-AF of L Master Labor Agreement. This agreement provides that a contractor shall have complete freedom in hiring workmen, except that he must first call on the local union having jurisdiction over the area in which the contracting work is to be done to satisfy his need for labor. The local union must immediately furnish the required number of competent and skilled workmen, and if after 48 hours notice it has failed to do so, the contractor is free to obtain workmen from any available source. Furthermore, the contractor is permitted to transfer workmen up to 10 per cent of his current requirements in any craft from the jurisdiction of one local union to the jurisdiction of another local union. He may transfer more than 10 per cent if permitted by the constitution and by-laws of the craft at the time the collective bargaining agreement was entered into. The by-laws of the Los Angeles County District Council of Carpenters permit such a transfer up to 50 per cent of a contractor's requirements, and also require a local union to honor a contractor's request for specific workmen. The agreement also provides that the unions will not call a strike against a contractor during the life of the agreement, but that all grievances or disputes over the interpretation or application of the terms of the agreement will be settled by a specified grievance procedure and by arbitration.

The complaint further alleges that plaintiffs entered into contracts to do the carpentry work on various construction

projects in the Los Angeles area. Pursuant to the collective bargaining agreement, plaintiffs called on defendant local unions to supply them with workmen. The workmen sent to plaintiffs were, however, unskilled and incompetent, and furthermore defendants informed plaintiffs that they would not be permitted to transfer workmen from the jurisdiction of one local union to the jurisdiction of another local union in excess of 10 per cent of their current requirements. Defendants also refused to honor plaintiffs' requests for named workmen or to permit plaintiffs to transfer their regular workmen from different parts of Los Angeles County to specific construction projects. Defendants ordered strikes of plaintiffs' employees on specific construction projects, and finally brought about a strike of all plaintiffs' employees.

The complaint alleges that the only reasons defendants gave for their conduct were that plaintiffs are labor contractors and are violating state safety regulations; that in fact plaintiffs are not labor contractors since they undertake to do complete carpentry jobs and not merely to furnish workmen, and that in any event labor contracting is prohibited neither by law nor by the collective bargaining agreement; that a state safety inspector found that plaintiffs were not violating any state safety regulations; and that defendants' purpose in calling strikes was to harass plaintiffs and totally destroy their business.

Plaintiffs seek to state three causes of action: breach of the collective bargaining agreement through a violation of the no-strike clause, a tortious attempt to destroy plaintiffs' business without any legitimate labor objective, and a violation of the Cartwright Act (Bus. & Prof. Code, §§ 16700-16758) by restraining trade without any legitimate labor objective. On the basis of the complaint, testimony, and numerous affidavits, the trial court issued a preliminary injunction against defendants' calling or continuing a strike against plaintiffs, and it is from this order that defendants appeal. In view of our conclusion that the issuance of the injunction was justified by the breach of the collective bargaining agreement, we do not find it necessary to consider the second and third causes of action stated in the complaint.

Defendants first contend that the trial court was without jurisdiction to issue its injunction because the National Labor Relations Board has exclusive jurisdiction over the conduct alleged in the complaint. █ It is now well established that if conduct may be reasonably deemed to fall within

the provisions of the Labor Management Relations Act defining unfair labor practices (29 U.S.C. §§ 158(a)-(b)), a state court has no jurisdiction to grant injunctive relief under either state or federal law, even if the National Labor Relations Board has declined to exercise jurisdiction over the controversy. (*Weber* v. *Anheuser-Busch, Inc.,* 348 U.S. 468, 481 [75 S.Ct. 480, 99 L.Ed. 546]; *Guss* v. *Utah Labor Relations Board,* 353 U.S. 1 [77 S.Ct. 598, 1 L.Ed 2d 601]; *Charles H. Benton, Inc.* v. *Painters Local Union,* 45 Cal.2d 677, 681 [291 P.2d 13].) The conduct alleged in the present case, however, cannot reasonably be deemed to fall within any of the provisions of section 8(b) of the federal act defining unfair labor practices by unions. (29 U.S.C. § 158(b).)

█ Conduct that constitutes a breach of a collective bargaining agreement is not for that reason alone an unfair labor practice. Proposals to make breach of contract an unfair labor practice were before Congress when it enacted the Taft-Hartley law, but were specifically rejected by the conference committee on the ground that once the parties had entered into a collective bargaining agreement, enforcement should be left to the usual processes of the law and not to the National Labor Relations Board. (See *Association of Westinghouse Salaried Employees* v. *Westinghouse Elec. Corp.,* 348 U.S. 437, 443-444 n. 2 [75 S. Ct. 488, 99 L.Ed. 510] (Mr. Justice Frankfurter concurring); Cox and Seidman, *Federalism and Labor Relations,* 64 Harv. L. Rev. 211, 243-245.)

█ Defendants contend, however, that the conduct alleged falls within the provisions of section 8(b)(4)(A) (29 U.S.C. § 158(b)(4)(A)), which make it an unfair labor practice for a labor organization "to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to . . . perform any service, where an object thereof is . . . forcing or requiring . . . any employer or other person . . . to cease doing business with any other person. . . ." This prohibition contemplates the existence of a primary employer and a secondary employer, and action by the union to induce the employees of the secondary employer to cease performing services for him in order to compel him to stop doing business with the primary employer, the ultimate object of the union's displeasure. It has no application to the present case since the conduct alleged consisted in calling strikes only of plaintiffs' employees, and there is no suggestion that employees of other employers, either general contractors or subcon-

tractors, were induced to refuse to perform services. (See *International Brotherhood of Elec. Workers* v. *National Labor Relations Board,* 341 U.S. 694, 698-706 [71 S.Ct. 954, 95 L.Ed. 1299] ; *National Labor Relations Board* v. *Denver Bldg. & Constr. Trades Council,* 341 U.S. 675, 685-690 [71 S.Ct. 943, 95 L.Ed. 1284] ; *National Labor Relations Board* v. *International Rice Milling Co.,* 341 U.S. 665, 670-673 [71 S.Ct. 961, 95 L.Ed. 1277] ; *National Labor Relations Board* v. *General Drivers* (5th Cir.), 225 F.2d 205, 208-209, cert. denied, 350 U.S. 914 [76 S.Ct. 198, 100 L.Ed. 801].)

██ The complaint does allege that as a result of defendants' activities plaintiffs will acquire the reputation of being in labor difficulties, and that general contractors will hesitate to do business with them. Such an effect on secondary employers, however, is always possible when there is a strike of the employees of a primary employer, and is not prohibited by section 8(b)(4)(A). One of the usual purposes of any strike is to make it more difficult for an employer to do business by persuading customers not to deal with him. Section 8(b)(4)(A) permits unions to use such persuasion, whether by direct solicitation of the customers or by indirect pressures of the kind alleged in the present case, so long as pressure is not brought on the customers by inducing strikes of their own employees. (*National Labor Relations Board* v. *Business Machine & Office Appliance Mechanics Board* (2d Cir.), 228 F.2d 553, 556-560, cert. denied, 351 U.S. 962 [76 S.Ct. 1024, 100 L.Ed. 1483] ; *Rabouin* v. *National Labor Relations Board* (2d Cir.), 195 F.2d 906, 911-912.) Defendants' interpretation of section 8(b) (4) (A) is contrary to the authorities and would change it from a prohibition against secondary strikes and boycotts to a sweeping prohibition against all strikes when an incidental effect is to persuade customers not to deal with an employer.

Sections 8(b)(3) and 8(d) (29 U.S.C. §§ 158(b)(3), (d)) furnish more substantial support for defendants' contention that the complaint alleges conduct constituting an unfair labor practice. Section 8(b) (3)provides: "It shall be an unfair labor practice for a labor organization . . . to refuse to bargain collectively with an employer. . . ." ██ Section 8(d) provides:

"to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions

of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

" (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

" . . . . . . . . . "

" (4) continues in full force and effect, without resorting to strike . . . all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later. . . ."

A strike in violation of section 8(d)(4) is an unfair labor practice, and a strike may violate 8(d)(4) whether or not it also breaches a no-strike provision in a collective bargaining agreement. A strike violates 8(d)(4) when the union has not complied with the notice and waiting requirements imposed by the statute, including the requirement that there be no strike before the expiration of the contract or before a time provided in the contract for reopening negotiations. (See *National Labor Relations Board* v. *Lion Oil Co.,* 352 U.S. 282 [77 S.Ct. 330, 332-336, 1 L.Ed.2d 331].)

■ All strikes during the life of a collective bargaining agreement, however, are not violations of 8(d)(4). A strike called to protest an employer's own unfair labor practice, for example, does not violate 8(d)(4) because it is not a strike aimed at terminating or modifying the contract. (*Mastro Plastics Corp.* v. *National Labor Relations Board,* 350 U.S. 270, 285-286 [76 S.Ct. 349, 100 L.Ed. 309].) ■ The decision in the Mastro Plastics case, and language in the recent Lion Oil case (77 S.Ct. at 335, and Mr. Justice Frankfurter concurring and dissenting at 338-341), indicate that the prohibition of 8(d) is confined to "bargaining strikes." Mr. Justice Frankfurter points out, 8(d) "has no effect on whether

unions may validly strike over nonbargaining matters." (77 S.Ct. at 341.) The National Labor Relations Board in its opinion in the Lyon Oil case makes it clear that its decision "has no bearing on the right to strike for reasons and purposes other than to obtain contract modification or termination. We say only that strikes to alter the provisions of a firm contract of fixed duration . . . must await the termination date." (*Lyon Oil Co.,* 109 N.L.R.B. 680, 684; see also *National Labor Relations Board* v. *Wagner Iron Works & Bridge Workers* (7th Cir.), 220 F.2d 126, 141, cert. denied, 350 U.S. 981 [76 S.Ct. 466, 467, 100 L.Ed. 850]; *National Labor Relations Board* v. *Mastro Plastics Corp.* (2d Cir.), 214 F.2d 462, 465-466, aff'd, 350 U.S. 270 [76 S.Ct. 349, 100 L.Ed. 309]; *Snively Groves, Inc.,* 109 N.L.R.B. 1394, 1395; but *cf. Local 3, United Packinghouse Workers* v. *National Labor Relations Board* (8th Cir.), 210 F.2d 325, 332-333, cert. denied, 348 U.S. 822 [75 S.Ct. 36, 99 L.Ed. 648]; *Penello* v. *International Union, United Mine Workers* (D.D.C.) 88 F.Supp. 935, 941.)

What is a "bargaining strike" in this sense depends on the purpose of 8(d). The federal act seeks to stabilize labor relations by encouraging employers and unions to negotiate and adhere to collective bargaining agreements covering the usual subjects of labor relations, such as wages, hours, and working conditions. To this end it compels employer and union to substitute to some extent collective bargaining for the economic weapons of strike and lockout as a means of creating or altering contractual relations, on the theory that collective bargaining is more likely to produce a workable contract and avoid social and economic disruption. █ When a collective bargaining agreement is actually in force, the statute prohibits strikes to compel changes in contractual relations at a time not contemplated by the parties, since the assurance of stable labor relations during the life of the contract is the principal incentive to entering such a contract in the first place. Thus the purpose behind section 8(d) does not encompass strikes whose aim is not to bring about a change in contractual relations, such as a strike to compel an employer to comply with his contract or to protest conduct wholly ungoverned by the contract. █ A union may of course bind itself not to engage in a strike for any purpose during the life of the agreement, but it is only with strikes used as a weapon in the bargaining process that Congress has in 8(d) shown sufficient concern to make them an unfair labor practice within the exclusive jurisdiction of the National

Labor Relations Board. (See *Timken Roller Bearing Co.* v. *National Labor Relations Board* (6th Cir.), 161 F.2d 949, 953-955.)

If the allegations in the complaint are true, the reason for the strike in the present case was either defendants' contention that plaintiffs are labor contractors and are violating state safety regulations, or the personal hostility of some of the individual defendants toward plaintiffs. At no time did defendants express dissatisfaction with the terms of the contract between the parties or inform plaintiffs of a desire to modify it in any regard. The object of the strike appears to have concerned a subject wholly ungoverned by the contract and outside the usual sphere of collective bargaining. Since it was not a strike to terminate or modify the contract, it did not constitute the unfair labor practice of refusing to bargain.

Since defendants' conduct as alleged cannot reasonably be deemed an unfair labor practice under any of the provisions of section 8(b), it is unnecessary for us to decide whether a court has jurisdiction to enjoin conduct that is in breach of a collective bargaining agreement and at the same time may be reasonably deemed an unfair labor practice. (See *Independent Petroleum Workers* v. *Esso Standard Oil Co.* (3d Cir.), 235 F.2d 401; *Textile Workers Union* v. *Arista Mills Co.* (4th Cir.), 193 F.2d 529; Dunau, *Contractual Prohibition of Unfair Labor Practices: Jurisdictional Problems,* 57 Colum.L. Rev. 52; but see *National Labor Relations Board* v. *Wagner Iron Works & Bridge Workers* (7th Cir.), 220 F.2d 126, 137, cert. denied, 350 U.S. 981 [76 S.Ct. 466, 467, 100 L.Ed. 850].)

 Defendants contend that even if this is not a case over which the National Labor Relations Board has exclusive jurisdiction, since it is an action for breach of a collective bargaining agreement it is within the exclusive jurisdiction of the federal courts under section 301(a) of the Labor Management Relations Act. (29 U.S.C. § 185(a).) Section 301(a) provides that: "Suits for violations of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

From the time of its enactment the federal courts were in continual disagreement as to whether section 301 required the creation of a characteristically federal decisional law to

govern collective bargaining agreements affecting interstate commerce, or merely provided a federal forum for the enforcement of substantive rights grounded in the law of the states. The majority of the lower federal courts held that section 301 created substantive rights based on federal law, and did not merely confer jurisdiction. Some were persuaded to this view by the fear that if section 301 were construed merely to extend the jurisdiction of the federal courts, it would confer upon them jurisdiction over cases not arising under the laws of the United States, and thus exceed the scope of the judicial power of the United States as defined in article III of the federal Constitution. (See *Signal-Stat Corp.* v. *Local 475, United Elec. etc. Workers* (2d Cir.), 235 F.2d 298, 300, cert. denied, 25 U.S.L. Week 3366 (U.S. June 10, 1957); *Shirley-Herman Co.* v. *International Hod Carriers* (2d Cir.), 182 F.2d 806, 808-809; *International Union of Operating Engineers* v. *Dahlem Const. Co.* (6th Cir.), 193 F.2d 470, 475; *United Elec. etc. Workers* v. *Oliver Corp.* (8th Cir.), 205 F.2d 376, 384-385.)

Recently the Court of Appeals for the First Circuit took the position that the supposed constitutional difficulty did not exist, since even if an action under 301 is based on state law, the case arises under the laws of the United States for the purposes of article III if federal court jurisdiction is necessary to implement a congressional policy governing collective bargaining agreements affecting interstate commerce. (*International Brotherhood of Teamsters* v. *W. L. Mead, Inc.*, 230 F.2d 576, 580-582, cert. dismissed, 352 U.S. 802 [77 S.Ct. 21, 1 L.Ed.2d 37].) This view could have prepared the way for an interpretation of 301 that preserved the application of state law but provided a federal forum for suits against unions that because of procedural obstacles could not be sued as entities in the courts of many states. The extremely fragmentary legislative history and almost total absence of any direction in the statute as to the content of a federal substantive law gave considerable support to such an interpretation. (*Textile Workers* v. *American Thread Co.* (D. Mass.), 113 F.Supp. 137, 139-141; see *Association of Westinghouse Salaried Employees* v. *Westinghouse Elec. Corp.*, 348 U.S. 437, 441-459 [75 S.Ct. 488, 99 L.Ed. 510] (Mr. Justice Frankfurter concurring and dissenting); Wollett and Wellington, *Federalism and Breach of the Labor Agreement*, 7 Stan.L.Rev. 445, 472-475; Cox, *Some Aspects of the Labor Management Relations Act*, 1947, 61 Harv.L.Rev. 274, 303-305.)

The United States Supreme Court, however, has now authoritatively declared that section 301 creates a federal substantive law governing collective bargaining agreements affecting interstate commerce. (*Textile Workers* v. *Lincoln Mills of Alabama,* 25 U.S.L. Week 4387 (U.S. June 3, 1957).) Although the case before the Court concerned only the power of a federal court to give a remedy not available under state law—specific enforcement of an agreement to arbitrate—the majority opinion broadly states that "the substantive law to apply in suits under § 301(a) is federal law which the courts must fashion from the policy of our national labor laws." "Federal interpretation of the federal law will govern, not state law. [Citation.] But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy. [Citation.] Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." (25 U.S.L. Week at 4389.)

It does not necessarily follow from a decision that federal law governs the rights of the parties that state courts are ousted of jurisdiction to enforce those rights. As Mr. Justice Bradley stated in *Claflin* v. *Houseman,* 93 U.S. 130, 136 [23 L.Ed. 833], "[I]f exclusive jurisdiction [in the federal courts] be neither express nor implied, the State courts have concurrent jurisdiction [to enforce federal rights] whenever, by their own constitution, they are competent to take it." Concurrent jurisdiction exists "where it is not excluded by express provision, or by incompatibility in its exercise arising from the nature of the particular case." (See *Gerry of California* v. *Superior Court,* 32 Cal.2d 119, 122-123 [194 P.2d 689].)

Section 301 does not expressly exclude state courts. On the contrary, it merely declares that an action for breach of a collective bargaining agreement may be brought in a federal court. Surely if Congress had intended to exclude state courts it would have used more forthright language. Nor does enforcement of collective bargaining agreements in state courts conflict with any federal policy embodied in section 301 or any other part of the federal statute. Defendants contend that the rationale of *Garner* v. *Teamsters etc. Union,* 346 U.S. 485 [74 S.Ct. 161, 98 L.Ed. 228], and *Weber* v. *Anheuser-Busch, Inc.,* 348 U.S. 468 [75 S.Ct. 480, 99 L.Ed. 546], which excludes state court jurisdiction over unfair labor practices in order that the National Labor

Relations Board may be free to develop a consistent federal policy, applies equally to exclude state court jurisdiction over actions that could be brought under section 301. Section 301, however, does not confide jurisdiction to one expert tribunal for the development of federal policy, but on the contrary gives jurisdiction to all the federal district courts. The possibility of conflict between state and federal courts is no greater than the possibility of conflict among the federal courts themselves, with uniformity ultimately dependent in either case on review by the United States Supreme Court. Moreover, federal courts are no more expert than state courts in the interpretation of contracts. (See *Philadelphia Marine Trade Assn.* v. *International Longshoremen's Assn.*, 382 Pa. 326 [115 A.2d 733, 736-737], cert. denied, 350 U.S. 843 [76 S.Ct. 84, 100 L.Ed. 751] ; *General Elec. Co.* v. *International Union United Automobile etc. Workers,* [Ohio Ct. App.], 108 N.E.2d 211, 219-222, appeal dismissed, 158 Ohio St. 555 [110 N.E.2d 424] ; Wollett and Wellington, *Federalism and Breach of the Labor Agreement,* 7 Stan.L.Rev. 445, 452-455; but *cf. International Plainfield Motor Co.* v. *Local 343, International Union United Automobile Workers,* [D. N.J.], 123 F.Supp. 683, 692; note, 57 Yale L.J. 630, 637 n. 24.)

 State courts therefore have concurrent jurisdiction with federal courts over actions that can be brought in the federal courts under section 301. It is obvious that in exercising this jurisdiction state courts are no longer free to apply state law, but must apply the federal law of collective bargaining agreements, otherwise the scope of the litigants' rights will depend on the accident of the forum in which the action is brought. What the substantive federal law of collective bargaining agreements is we cannot now know. Until it is elaborated by the federal courts we assume it does not differ significantly from our own law.

If in the present case it is not necessary to determine wherein the substantive federal law differs from the law we have until now applied, another problem does press for resolution: what remedies are available in a state court vindicating rights created by section 301? It can be argued that since federal courts in actions brought under 301 cannot enjoin strikes in breach of a collective bargaining agreement because of the prohibitions of the Norris-LaGuardia Act (29 U.S.C. §§ 101, 104), state courts enforcing rights created by 301 likewise cannot issue an injunction and give a remedy not available in the federal courts.

Some courts have broadly suggested that section 301 author-
izes even federal courts to use injunctive process for the
"full enforcement of the substantive rights created by section
301(a) . . . ," apparently notwithstanding the restrictions
of the Norris-LaGuardia Act. (*Milk & Ice Cream Drivers
Union* v. *Gillespie Milk Products Corp.*, (6th Cir.) 203 F.2d
650, 651.) Although we do not pause to decide this question,
the better view would seem to be that the inclusion of specific
instances in the Labor Management Relations Act in which
injunctive relief is expressly authorized negatives any general
repeal of the Norris-La Guardia Act in respect to the enforce-
ment of collective bargaining agreements. (See *W. L. Mead,
Inc.* v. *International Brotherhood of Teamsters* (1st Cir.),
217 F.2d 6, 8-10, cert. dismissed, 352 U.S. 802 [77 S.Ct. 21,
1 L.Ed.2d 37] ; *Associated Tel. Co.* v. *Communication Workers,*
(S.D. Cal.), 114 F.Supp. 334, 340-341; *United Packinghouse
Workers* v. *Wilson & Co.*, (N.D. Ill.), 80 F.Supp. 563, 567-
568.) By its holding in *Textile Workers* v. *Lincoln Mills of
Alabama,* 25 U.S.L. Week 4387, 4389 (U.S. June 3, 1957),
that the Norris-LaGuardia Act was never intended to prohibit
specific enforcement of agreements to arbitrate, the Supreme
Court has not suggested otherwise ; strike injunctions clearly
were intended to fall under the ban of the act.

 If it is assumed that federal courts cannot enjoin
strikes in actions under section 301 save in compliance with
the strict requirements of the Norris-La Guardia Act, state
courts enforcing federal rights are not necessarily subject
to the same restraint. In the first place it is not entirely clear
that Congress can compel a state court to withhold a remedy
that would be available if the action arose under the contract
law of the state. Congress can compel a state court to en-
force a federal right and give a prescribed remedy when it is
essential to the full realization of the right, and the state
court would be competent under its own law to give a remedy
of like character for a right based on state law. (*Testa* v.
*Katt,* 330 U.S. 386 [67 S.Ct. 810, 91 L.Ed. 967, 172 A.L.R.
225] ; *Miller* v. *Municipal Court,* 22 Cal.2d 818, 836-851 [142
P.2d 297].) Moreover, in cases brought in state courts under
the Federal Employers Liability Act (45 U.S.C. § 51 et seq.),
an area in which the most vexing problems of state enforce-
ment of federal rights have arisen, it has been held that state
procedure must give way if it impedes the uniform application
of the federal statute essential to effectuate its purpose, even
though the procedure would apply to similar actions arising

under state law. (*E.g. Dice* v. *Akron, Canton & Youngstown R.R.,* 342 U.S. 359, 362-364 [72 S.Ct. 312, 96 L.Ed. 398].)

It would be a step beyond these decisions, however, to hold that a state enforcing a federal right can be compelled to withhold a remedy usually available in its courts, although it might be said that since Congress can completely exclude state jurisdiction it can dictate that certain remedies be withheld if necessary to implement federal policy. Some light is thrown on this question by *Brown* v. *Gerdes,* 321 U.S. 178 [64 S.Ct. 487, 88 L.Ed. 659]. In that case the court held that the Federal Bankruptcy Act deprived a state court of power to fix or grant fees to counsel for trustees, even though they had performed services in actions before the court and under state law were entitled to a lien on their client's cause of action. (See also *Hines* v. *Lowrey,* 305 U.S. 85 [59 S.Ct. 31, 83 L.Ed. 56].) This decision, however, does not settle the precise issue before us, and a strong argument can be made that Congress must take the state courts as it finds them in regard to the availability of equitable remedies, and can require only that they not discriminate against litigants enforcing federal rights.

In the converse situation, when a federal court enforces a state-created right and jurisdiction is based on diversity of citizenship, it was established that the court could give an equitable remedy not available under state law (*Guffey* v. *Smith,* 237 U.S. 101 [35 S.Ct. 526, 59 L.Ed. 856]; see *Guaranty Trust Co.* v. *York,* 326 U.S. 99, 105-106 [65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231]), or withhold a remedy that was available under state law. (*Pusey & Jones Co.* v. *Hanssen,* 261 U.S. 491, 494-499 [43 S.Ct. 454, 67 L.Ed. 763].) Considerable doubt has been cast on the vitality of this doctrine by decisions stressing more and more that the goal of diversity jurisdiction is substantial similarity of outcome whether an action is brought in a state or federal court, and that remedies often go to the substance of the right. (*E.g. Bernhardt* v. *Polygraphic Co.,* 350 U.S. 198, 202-204 [76 S.Ct. 273, 100 L.Ed. 199]; *cf. Angel* v. *Bullington,* 330 U.S. 183, 191-192 [67 S.Ct. 657, 91 L.Ed. 832].) Whatever the implications of diversity jurisdiction, however, they do not necessarily determine whether a state court, under the compulsion of the supremacy clause, must withhold a specific remedy. A state court enforcing a federal right is not simply another federal court. (*Minneapolis & St. Louis R.R.* v. *Bombolis,* 241 U.S. 211, 222 [36 S.Ct. 595, 60 L.Ed. 961].)

The difficulties that inhere in the question of congressional power to control equitable remedies available in state courts strengthen our conviction that, whether or not Congress could deprive state courts of the power to give such remedies when enforcing collective bargaining agreements, it has not attempted to do so either in the Norris-La Guardia Act or section 301.

■ The Norris-La Guardia Act is in terms drawn as a limitation on the courts of the United States. "No court of the United States," declares section 1, "shall have jurisdiction to issue any . . . injunction in a case involving or growing out of a labor dispute . . . ," and a court of the United States is defined in section 13(d) as "any court of the United States whose jurisdiction has been or may be conferred or defined or limited by Acts of Congress, including the courts of the District of Columbia." (29 U.S.C. §§ 101, 113(d).) The statute aimed to restrict the federal equity power, and was justified constitutionally on the basis of Congress' power to regulate the jurisdiction of the federal courts. (*Brotherhood of R.R. Trainmen* v. *Toledo, Peoria & Western R.R.*, 321 U.S. 50, 58, 63 [64 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810]; *Lauf* v. *E. G. Shinner & Co.*, 303 U.S. 323, 330 [58 S.Ct. 578, 82 L.Ed. 872].) It did not limit the remedial power of the state courts (see *United Elec. etc. Workers* v. *Westinghouse Elec. Corp.*, (E.D. Pa.), 65 F.Supp. 420, 422; *General Bldg. Contractors' Assn.* v. *Local Unions*, 370 Pa. 73 [87 A.2d 250, 254]; *Markham & Callow, Inc.* v. *International Woodworkers etc. Union*, 170 Ore. 517 [135 P.2d 727, 746], citing Frankfurter and Greene, The Labor Injunction at 220; 39 Ops. U.S. Atty. Gen. 242, 246), and could not constitutionally have done so since its prohibition was not restricted to injunctions in labor disputes affecting interstate commerce or any other subject over which Congress has paramount power.

■ Section 301 of the Labor Management Relations Act does not embody any policy that requires a state court enforcing rights created by that section to withhold injunctive relief. The principal purpose of section 301 was to facilitate the enforcement of collective bargaining agreements by making unions suable as entities in the federal courts, and thereby to remedy the one-sided character of existing labor legislation. (See *United Packinghouse Workers* v. *Wilson & Co.*, (N.D. Ill.), 80 F.Supp. 563, 568.) We would give altogether too ironic a twist to this purpose if we held that the actual

effect of the legislation was to abolish in state courts equitable remedies that had been available, and leave an employer in a worse position in respect to the effective enforcement of his contract than he was before the enactment of section 301.

Nothing in the nature of the rights created by section 301 requires that injunctive relief be denied in their enforcement. Such relief would of course not impair any federal contract right, nor would it expand it in conflict with any policy that we have been able to discern in the statute. To the contrary, the principal purpose of the statute is to encourage the formation and effective enforcement of collective bargaining agreements. (See *Textile Workers* v. *Lincoln Mills of Alabama*, 25 U.S.L. Week 4387, 4388 and n. 4 (U.S. June 3, 1957).) The restriction on the remedies available in the federal courts arises not from any policy in the Labor Management Relations Act itself but from the Norris-La Guardia Act, and the policy of that statute as we have seen is confined to the federal courts. (See *Associated Tel. Co.* v. *Communication Workers*, (S.D. Cal.), 114 F.Supp. 334, 341; *Philadelphia Marine Trade Assn.* v. *International Longshoremen's Assn.*, 382 Pa. 326 [115 A.2d 733, 736], cert. denied, 350 U.S. 843 [76 S.Ct. 84, 100 L.Ed. 751]; Wollett and Wellington, *Federalism and Breach of the Labor Agreement*, 7 Stan.L.Rev. 445, 456-460.)

 Finally, there is no invariable requirement, implicit in the federal system, that a state court enforcing a federal right must not go beyond the remedies available in a federal court. Uniformity in the determination of the substantive federal right itself is no doubt a necessity, but such uniformity is not threatened because a state court can give a more complete and effective remedy. Several federal courts, proceeding on the hypothesis that substantive rights in actions under section 301 arise out of state law, have concluded that the federal court is not confined to the remedies available in the state courts. (*Local 205, United Elec. Workers* v. *General Elec. Co.*, 233 F.2d 85, 94-95, aff'd on other grounds, 25 U.S.L. Week 4391 (U.S. June 3, 1957); *Textile Workers* v. *American Thread Co.*, (D. Mass), 113 F.Supp. 137, 141; See Cox, *Grievance Arbitration in the Federal Courts*, 67 Harv.L.Rev. 591, 601.) We cannot see why, under the opposite hypothesis, it is not equally true that a state court is not confined to remedies available in a federal court when the restriction on the federal court does not flow from the statute creating the federal right.

As a final attack on the jurisdiction of the trial court, defendants contend that plaintiffs are precluded from maintaining the present action because the issue involved is referable to arbitration under the collective bargaining agreement. The issue defendants contend must be arbitrated is whether the strike was in breach of the contract.

Article III(A) of the contract provides that, "it is the purpose and intent of the parties hereto that all grievances or disputes arising between them over the interpretation or application of the terms of this Agreement shall be settled by the procedure set forth in Article V hereof, and that during the term of this Agreement the Unions . . . shall not . . . call or engage in, sanction, or assist in a strike against . . . the Contractors. . . ." Article V is entitled, "Procedure For Settlement of Grievances and Disputes." In paragraph A it provides that employees are to present grievances and disputes to their craft steward, who will report them to a special representative. The special representative will then attempt to adjust the dispute with the contractor. Paragraphs C and D provide that if this method of settlement fails, the dispute or grievance may be referred to a Joint Conference Board and from there to a Joint Arbitration Committee. If a majority vote of the Joint Arbitration Committee cannot be obtained, the grievance or dispute is to be submitted to an arbiter whose award is final and binding. Paragraph E repeats the provision of article III that all disputes or grievances arising out of the interpretation or application of any of the terms or conditions of the contract shall be determined by the procedure set forth in article V.

The arbitrability of a dispute may itself be subject to arbitration if the parties have so provided in their contract. In this situation the court should stay proceedings pending the arbiter's determination of his own jurisdiction unless it is clear that the claim of arbitrability is wholly groundless. (See *International Union, United Automobile Workers* v. *Benton Harbor Malleable Industries* (6th Cir.), 242 F.2d 536, 539, petition for cert. filed, 25 U.S.L. Week 3361 (U.S. May 24, 1957); *Local 205, United Elec. etc. Workers* v. *General Elec. Co.* (1st Cir.), 233 F.2d 85, 101, aff'd, 25 U.S.L. Week 4391 (U.S. June 3, 1957); Scoles, *Review of Labor Arbitration Awards on Jurisdictional Grounds*, 17 U.Chi.L. Rev. 616, 620-621.) Of course, even when the parties have conferred upon the arbiter the unusual power of de-

termining his own jurisdiction, the court cannot avoid the necessity of making a certain threshhold determination of arbitrability, namely, whether the parties have in fact conferred this power on the arbiter. There is no indication in the present contract that the parties intended any such result.

It may be that leaving to an arbiter the question of arbitrability is a desirable procedure from the point of view of harmonious labor relations (see Arbitrability, 1951 Report of the Committee on Improvement of Administration of Union-Employer Contracts, Section of Labor Relations Law, American Bar Assn., in Readings on Labor Law 172, 192-194 (Reynard ed. 1955)), although some have expressed fear that the procedure may be used to bring about unbargained for changes in the relations of the parties. (See minority report in *id.* at 201.) Whatever the merits of the procedure, we think it sufficiently outside the usual understanding of the relations of court and arbiter and their respective functions to assume that the parties expected a court determination of arbitrability unless they have clearly stated otherwise. (See *Philadelphia Marine Trade Assn.* v. *International Longshoremen's Assn.*, 382 Pa. 326 [115 A.2d 733, 738], cert. denied, 350 U. S. 843 [76 S.Ct. 84, 100 L.Ed. 751].)

Plaintiffs take the position that defendants' breach of contract is not an issue referable to arbitration because by striking in violation of the no-strike clause defendants have themselves repudiated the arbitration procedure. This argument misconceives the question since it assumes that defendants have in fact breached the no-strike provision, the very issue that defendants dispute and say must go to arbitration.

All strikes during the life of a contract are not necessarily violations of a no-strike clause, even though on its face the prohibition appears to be absolute. (See The No-Strike Clause, 1952 Report of the Committee on Improvement of Administration of Union-Employer Contracts, Section of Labor Relations Law, American Bar Assn., in Readings on Labor Law 255, 275-277 [Reynard ed. 1955).) The question is whether the collective bargaining agreement requires arbitration to determine if defendants' conduct violates the no-strike clause, or whether the court itself may make this determination. As with all problems of contract interpretation, the answer must reflect the intention of the parties.

This same question has been before the lower federal courts on numerous occasions. Many of the decisions, although helpful, are not determinative of the problem before us be-

cause they turn on the language of a particular collective bargaining agreement. Some of the decisions are in irreconcilable conflict.[1]

 We think the trial court was right in concluding that the parties to the contract in the present case did not contemplate arbitration of a breach of the no-strike clause. It is true that the language of the arbitration provision is broad, stating that "all grievances or disputes arising between . . . [the parties] over the interpretation or application of the terms of this Agreement shall be settled by the procedure set forth in Article V. . . ." If this were the only provision to be considered, it might reasonably be argued that the question of whether a strike is in breach of contract is arbitrable since it involves interpretation of a term of the contract. The contract, however, must be read as a whole and the grievance and arbitration procedure viewed in the light of its purpose.

The grievance procedure set forth in article V is designed primarily to cope with the usual employee complaints concerning working conditions, wrongful discharge, and the like. The first steps in the procedure require a grievance to be submitted to a craft steward and then reported to a special representative for adjustment. It is inconceivable that the

---

[1]*International Brotherhood of Teamsters* v. *W. L. Mead, Inc.*, (1st Cir.) 230 F.2d 576, 582-584, cert. dismissed, 352 U.S. 802 [77 S.Ct. 21, 1 L.Ed.2d 37], (semble: the issue is not arbitrable); *Shirley-Herman Co.* v. *International Hod Carriers*, (2d Cir.) 182 F.2d 806 (semble: not arbitrable); *Markel Elec. Products, Inc.* v. *United Elec. Workers*, (2d Cir.) 202 F.2d 435, 436-437 (not arbitrable); *Signal-Stat Corp.* v. *Local 475, United Elec. etc. Workers*, (2d Cir.) 235 F.2d 298, 301, cert. denied, 25 U.S.L. Week 3366 (U.S. June 10, 1957), (arbitrable; possibly overruling the Shirley-Herman and Markel cases, *supra*); *Lewittes & Sons* v. *United Furniture Workers*, 95 F.Supp. 851, 853-854 (S.D. N.Y.) (arbitrable); *Metal Polishers etc. Union* v. *Rubin*, (E.D. Pa.) 85 F.Supp. 363 (not arbitrable); *Pennsylvania Greyhound Lines, Inc.* v. *Amalgamated Assn. of Street, Elec. Ry. & Motorcoach Employees*, (W.D. Pa.) 98 F.Supp. 789, 791, rev'd on other grounds, (3d Cir.) 193 F.2d 327 (arbitrable); *International Union United Furniture Workers* v. *Colonial Hardwood Flooring Co.*, (4th Cir.) 168 F.2d 33, 35 (not arbitrable); *United Elec. etc. Workers* v. *Miller Metal Products, Inc.* (4th Cir.) 215 F.2d 221, 222-223 (not arbitrable); *International Union, United Automobile Workers* v. *Benton Harbor Malleable Industries*, (6th Cir.) 242 F.2d 536, 540-542, petition for cert. filed, 25 U.S.L. Week 3361 (U.S. May 24. 1957), (not arbitrable); *Hoover Motor Express Co.* v. *Teamsters etc. Union*, (6th Cir.) 217 F.2d 49, 53-54 (not arbitrable); *Square D Co.* v. *United Elec. etc. Workers*, (E.D. Mich.) 123 F.Supp. 776, 782-783 (not arbitrable); see *Philadelphia Marine Trade Assn.* v. *International Longshoremen's Assn.*, 382 Pa. 326 [115 A.2d 733, 737-738], cert. denied, 350 U.S. 843 [76 S.Ct. 84, 100 L.Ed. 751], (semble: not arbitrable).

parties thought an employer would be required to follow these steps in prosecuting his objection to a strike. It is possible that they expected employer complaints to be presented directly to the Joint Conference Board or the Joint Arbitration Committee. The later steps in the grievance procedure, however, and arbitration itself, appear to be integrated parts of a single scheme for the settlement of disputes. They are to be resorted to when the earlier steps in the procedure have failed to yield a settlement, and purport to dispose of the same disputes and grievances that are the subject of the earlier steps.

A more persuasive consideration, however, is the relation between the grievance and arbitration procedure and the no-strike guarantee. The grievance and arbitration procedure is an alternative to the strike as a means of settling disputes, and it is clear that the parties bound themselves to resort to this procedure for the very purpose of avoiding the possibility of a strike. The parties' intention is shown by the fact that defendants' promise in article III not to resort to a strike follows immediately after their promise to use the grievance procedure. Moreover, the preamble to the contract states that, ''it is the desire of the parties hereto to provide, establish and put into practice effective methods for the settlement of misunderstandings, disputes or grievances between the parties hereto to the end that the Contractors are assured continuity of operation and the members of the Unions are assured continuity of employment, and industrial peace is maintained. . . .'' The grievance and arbitration procedure assumes that work goes on. Resort to the procedure is designed to avoid the necessity of a strike, not to adjudicate a strike once it has occurred, and the purpose of the procedure limits its applicability. (See *International Union, United Automobile Workers* v. *Benton Harbor Malleable Industries* (6th Cir.), 242 F.2d 536, 540-541, petition for cert. filed, 25 U.S.L. Week 3361 (U.S. May 24, 1957).)

It is urged that arbitration provisions in collective bargaining agreements should when possible be construed broadly to cover all disputes between the parties to the end that the contract will provide a complete system of government for the parties, a system far more satisfactory than any the courts can provide and, because established by the parties themselves, more likely to lead to industrial peace. We do not dispute the attractiveness of the ideal, but it does not justify overriding the parties' intentions and forcing on them a method of decision wholly unexpected in its appli-

cation. As Mr. Justice Cardozo pointed out in *Marchant* v. *Mead-Morrison Mfg. Co.*, 252 N.Y. 284 [169 N.E. 386, 391, 393], "Courts are not at liberty to shirk the process of construction under the empire of a belief that arbitration is beneficent, any more than they may shirk it if their belief happens to be the contrary. No one is under a duty to resort to these conventional tribunals, however helpful their processes, except to the extent he has signified his willingness. . . . " "[The contracting parties] . . . are not to be trapped by a strained and unnatural construction of words of doubtful import into an abandonment of legal remedies, unwilled and unforeseen."

There is no merit in defendants' contention that because plaintiffs did not have the contractor's license required by sections 7025-7031 of the Business and Professions Code, they are barred from maintaining the present action by section 7031 or the common-law rule that illegal contracts will not be enforced. Section 7031 bars actions "for the collection of compensation" for contracting work, not actions to enforce collective bargaining agreements. Plaintiffs do not seek to enforce an illegal contract; their labor contract is not prohibited by the licensing statute and its validity is unrelated to the question whether plaintiffs can legally enter into construction contracts. If plaintiffs failed to obtain a partnership license, they are not for that reason completely outside the protection of the law and denied relief from torts committed against them or breaches of contract other than contracts to recover compensation. (See *Grant* v. *Weatherholt*, 123 Cal.App.2d 34, 42-44 [266 P.2d 185].)

Finally, there was sufficient evidence to justify the issuance of the preliminary injunction. Defendants do not deny the strike, nor on this appeal do they contend, as they did in the trial court, that the contract was not in force at the time of the strike or that plaintiffs were not parties to it. The reasons for the strike are obscure. There is some indication that defendants objected to plaintiffs on the grounds that they were labor contractors and violating state safety regulations. Defendants failed, however, to explain precisely what labor contracting is, to show that plaintiffs were engaged in it, or even if they were, that defendants were justified in striking rather than resorting to the grievance procedure. The evidence tended to show that plaintiffs had not violated any state safety regulation. There was substantial evidence to support plaintiffs' claim that the strike was in breach of

contract and that they would be irreparably injured if it continued.

The order is affirmed.

Gibson, C. J., Spence, J., and McComb, J., concurred.

Shenk, J., and Schauer, J., concurred in the judgment.

CARTER J.—I dissent.

In this case the majority holds that where there is a collective bargaining agreement between a union and employer, with a no-strike provision, which has been violated by the union, but there has been no unfair labor practice under the Labor Management Relations Act (29 U.S.C.A. § 151 et seq.) a state court has jurisdiction to give preventive relief against such violation; but, however, the federal substantive law (29 U.S.C.A. § 185) is exclusively controlling in rights and duties under such collective bargaining agreements where interstate commerce is affected (*Textile Workers Union of America* v. *Lincoln Mills of Alabama,* 353 U.S. 448 [77 S.Ct. 912, 1 L.Ed.2d 972]); that state courts have jurisdiction generally of proceedings under section 301 of the Labor Management Relations Act although they must apply the federal substantive law; *that in applying such law they* (state courts) *may give whatever form of relief they deem proper, for example, injunctive relief enjoining the violation of a no-strike provision of the bargaining agreement as in the case at bar.* I cannot agree with this latter holding. On the contrary, it is my view that a state court may not give any more stringent or different relief than could be given by a federal court.

The rights under the bargaining agreement being controlled by federal law, that law must also measure the remedies available for otherwise the federal law is not being applied. Turning to the federal law, it is conceded by the majority that federal courts could not give injunctive relief under section 301 of the Labor Management Relations Act. It states: "Some courts have broadly suggested that section 301 authorizes even federal courts to use injunctive process for the 'full enforcement of the substantive rights created by section 301 (a) . . . ,' apparently notwithstanding the restrictions of the Norris-LaGuardia Act. . . . [T]he better view would seem to be that the inclusion of specific instances in the Labor Management Relations Act in which injunctive relief is ex-

pressly authorized *negatives any general repeal of the Norris-LaGuardia Act in respect to the enforcement of collective bargaining agreements.* (See *W. L. Mead, Inc.* v. *International Brotherhood of Teamsters* (1st Cir.) 217 F.2d 6, 8-10, cert. dismissed, 352 U.S. 802 [77 S.Ct. 21, 1 L.Ed.2d 37]; *Associated Tel. Co.* v. *Communication Workers,* (S.D. Cal.) 114 F.Supp. 334, 340-341; *United Packinghouse Workers* v. *Wilson & Co.,* (N.D. Ill.), 80 F.Supp. 563, 567-568.)'' (Emphasis added.) The Norris-LaGuardia Act (29 U.S.C.A. § 101 et seq.) to which reference is made prohibits injunctive relief generally or demands compliance with certain requirements before it may be granted. If it is applicable it is conceded that an injunction would not be available in this case if the action were in the federal court. The majority reasons, however, that the Norris-LaGuardia Act relates only to the jurisdiction of federal courts, but there is nothing in section 301 of the Labor Management Relations Act which forbids an injunction and the purpose of uniformity in the disposal of labor relations matters affecting interstate commerce is not involved. There are several reasons why those arguments are not persuasive.

In *Textile Workers Union of America* v. *Lincoln Mills of Alabama, supra,* 353 U.S. 448 [77 S.Ct. 912, 1 L.Ed.2d 972], the United States Supreme Court held that substantive federal law must apply to an action under section 301 to specifically enforce an arbitration provision in a bargaining agreement (the action was in a federal district court) and the Norris-La Guardia Act was not a bar because the failure to arbitrate was not one of the abuses the Norris Act was aimed at and the policy in favor of enforcing such agreements expressed in the Labor Management Relations Act was clear, but in the course of its opinion there is a clear indication that in declaring the federal substantive law applicable it was also including so-called procedural matters of importance such as injunctive relief. For illustration, the court said: ''Both the Senate and the House took pains to provide for 'the usual processes of the law' by provisions which were the substantial equivalent of § 301(a) in its present form. Both the Senate Report and the House Report indicate a primary concern that unions as well as employees should be bound to collective bargaining contracts. But there was also broader concern—*a concern with a procedure* for making such agreements enforceable in the courts by either party. . . .

''Plainly the agreement to arbitrate grievance disputes is

the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that *federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way.* . . . And when in the House the debate narrowed to the question whether § 301 was more than jurisdictional, it became abundantly clear that the purpose of the section was to provide the necessary *legal remedies.* . . .

"It seems, therefore, clear to us that Congress adopted a policy which placed *sanctions* behind agreements to arbitrate grievance disputes. . . . Other problems will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved *by looking at the policy* of the legislation and *fashioning a remedy* that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. . . . Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights." (Emphasis added.) Indeed the issue involved in the Textile case was whether section 301 authorized a particular *remedy*, specific enforcement, in case of breach of a bargaining agreement. I deduce from this that the federal law including the remedies available or not available is to be applied when the action is in the state court under section 301.

Moreover, there is additional reason why the remedy such as injunction, should not be given by the state court if it may not be given by a federal court. Such a remedy is more than mere procedure. It goes to the very essence of the right itself. In many instances it would make the difference of whether or not the right could be truly realized. This is especially true in injunctions in labor disputes, such as an injunction against a strike. The case is usually won or lost at the preliminary injunction stage, even before the hearing on the application for a permanent injunction—the final judgment. If a preliminary injunction is obtained, economic circumstances may break the strike and render impotent the efforts of the union to secure the goals sought by it. If it is not secured, management and labor continue their bargaining in the manner contemplated by the law. The purpose of the Norris-LaGuardia Act is to prevent injunctive restraints in such disputes with the thought that management and labor may have a free hand to iron out their problems.

A state court, in enforcing rights measured by federal law (rights here under collective bargaining agreement) cannot obstruct or give greater or lesser relief than would be available in a federal court. It is said in *Brown* v. *Western Ry. of Alabama*, 338 U.S. 294, 296 [70 S.Ct. 105, 94 L.Ed. 100], where the question was whether the pleading was sufficient in an action in a Georgia court under the Federal Employer's Liability Act: "The argument is that while state courts are without power to detract from 'substantive rights' granted by Congress in FELA cases, they are free to follow their own rules of 'practice' and 'procedure.' To what extent rules of practice and procedure may themselves dig into 'substantive rights' is a troublesome question at best as is shown in the very case on which respondent relies. *Central Vermont R. Co.* v. *White*, 238 U.S. 507 [35 S.Ct. 865, 59 L.Ed. 1433]. Other cases in this Court point up the impossibility of laying down a precise rule to distinguish 'substance' from 'procedure.' Fortunately, we need not attempt to do so. A long series of cases previously decided, from which we see no reason to depart, makes it our duty to construe the allegations of this complaint ourselves in order to determine whether petitioner has been denied a right of trial granted him by Congress. *This federal right cannot be defeated by the forms of local practice.*" (Emphasis added.) And it is said: "It follows also from the rule as to supremacy of the United States within its proper sphere that the individual states may not in any way impair, qualify, or disturb the enjoyment of federal constitutional or statutory rights. Accordingly, a state may not impose any condition requiring relinquishment of a right guaranteed by the federal Constitution; nor may it impose such conditions as it sees fit with respect to rights created and causes of action conferred by an act of congress, or defeat a federal right by forms of local practice." (81 C.J.S., States, § 7.) It is said in *Mine Workers* v. *Arkansas Flooring Co.*, 351 U.S. 62, 75 [76 S.Ct. 559, 100 L.Ed. 941], "Such being the case, the state court is governed by the federal law which has been applied to industrial relations, like these, affecting interstate commerce and the state court erred in enjoining the peaceful picketing here practiced. *A 'State may not prohibit the exercise of rights which the federal Acts protect.'*" (Emphasis added.) In the case at bar the right to be not enjoined under the Norris-LaGuardia Act (see, also, 29 U.S.C.A. § 163) is a part of the federal right—a part and parcel of the rights

which may be exercised with reference to bargaining agreements. Certainly a state court cannot give more relief (in fact, relief which will be the end of the case) than a federal court when administering federal law. If it may, the requirement that the federal law be applied may well dwindle to nothing and there will be no uniformity as is sought by the federal act in labor relations affecting interstate commerce. The right will be no greater than the remedy afforded for its protection which may vary from state to state. If as in *Brown* v. *Western Ry. of Alabama, supra,* 338 U.S. 294, the mere matter of state rules of pleading may not control in the enforcement of a federal law by a state court, then certainly the important and fundamental matter of allowing an injunction under state law cannot stand if the federal law forbids it. In short the federal law is exclusive in the field of bargaining agreements affecting commerce. When a state entertains jurisdiction and applies that law it should be bound by all the important restrictions including those embraced in the Norris-LaGuardia Act. It would not be doubted that if section 301 which gives federal courts jurisdiction over actions involving collective bargaining agreements where interstate commerce is affected, but also provided that no injunctive relief was available then no such relief would be proper if the action is in a state rather than federal court. The fact that the Norris-LaGuardia Act is in a separate statute should not alter the result.

I would therefore reverse the order granting a preliminary injunction.

Appellants' petition for a rehearing was denied October 8, 1957. Carter, J., was of the opinion that the petition should be granted.